UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JAMES ANDREW SCOTT, II, | ) |
| | ) Case No. 2:19-cv-1891-GMB |
| Plaintiff, | ) |
| | ) OPPOSED |
| v. | ) |
| | ) |
| REMINGTON ARMS COMPANY, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

# REMINGTON'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S PROFFERED LIABILITY EXPERT AND MOTION FOR SUMMARY JUDGMENT

Remington Arms Company, LLC ("Remington") replies to Plaintiff's Opposition (Doc. 62, or "Response") to its motion (Doc. 60) as follows:

## I. INTRODUCTION

Plaintiff's Response further highlights that his expert, Jerry Morris, offered inadmissible defect and causation opinions. Morris's original opinions set forth in his expert "report" and deposition are so plainly deficient that Plaintiff has now filed a new affidavit from Morris (Doc. 62-3) containing never-before-disclosed opinions, some of which flatly contradict Morris's sworn deposition testimony. Rules 37 and 26 require exclusion of the new affidavit, as does the "sham" affidavit rule.

Regardless, even with the new affidavit, Morris failed to offer any pertinent testing or experience to salvage his deficient defect and causation opinions. Neither Plaintiff nor Morris dispute that he repeatedly tested the rifle in attempt to make it accidentally discharge without a trigger pull—and it would not. Morris's testing confirmed that the Rifle could <u>only</u> be made to fire with the safety OFF and the trigger pulled. Nor does Plaintiff dispute that admissible expert testimony that passes *Daubert* and Fed. R. Evid. 702 scrutiny is required to avoid summary judgment under Fed. R. Civ. P. 56. Remington's motion should be granted.

## II. ARGUMENT

### A. The new Morris affidavit is untimely and should be disregarded.

Under Rule 37(c)(1), when "a party fails to provide information or identify a

1

witness as required by [Rule] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citing Rule 37(c)(1) and holding that the "burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party."). Rule 37(c) is a "self-executing sanction for failure to make a disclosure[.]" *Barron v. Fed. Rsrv. Bank of Atlanta*, 129 F. App'x 512, 519 (11th Cir. 2005).

Plaintiff disclosed the new Morris affidavit on February 14, 2024, by filing it in opposition to Remington's summary judgment motion. The new affidavit, dated February 12, was disclosed over **four months** after Morris's Rule 26(a)(2)(B) report was due and disclosed on October 2, 2023, **two months** after the expert's deposition testimony on December 13, 2023, and **three weeks** after Remington's motion was filed. (*See* Doc. 55; Doc. 60; Doc. 62.)[1]

In his new affidavit, Morris concludes for the first time that the Rifle fired "more likely than not" without a trigger pull at the time of the accident. (Doc. 62-3

---

[1] Plaintiff styles the Morris affidavit as a "rebuttal" to Remington's arguments about the inadmissibility of his opinions. Rule 26(a)(2)(D)(ii) requires true rebuttal evidence be submitted within 30 days after the other party's disclosures. Per agreement of the parties, Remington served its expert disclosures on December 19, 2023, and the information and opinions Plaintiff now attempts to "rebut" with the new Morris affidavit on February 14, 2024, is nearly a month late, and well beyond the 30 day requirement of Rule 26(a)(2)(D)(ii). The untimely affidavit must be stricken under Rule 37(c).

2

at pp. 2-3.) Nowhere in his Rule 26 report or deposition did Morris offer this "more likely than not" opinion. Instead, when asked at deposition, Morris testified he could not offer that opinion:

> Q. In your opinion, did this rifle fire at the time of this incident that we're talking about here where the little girl was killed without the trigger being pulled?
> A. That I can't answer, because I wasn't there. But in my test, I couldn't make the rifle discharge without the trigger moving.

(Doc. 60-7, Morris Depo. at 34:13-19.) Indeed, the tests Morris conducted showed the Rifle would fire only when the trigger was pulled. (*Id*. at 58:12-59:23.) The obvious takeaway is that Plaintiff understood after reading Remington's motion that such testimony is fatal to the prosecution of this product liability case.

This new affidavit opinion that the Rifle "more likely than not" fired without a trigger pull should also be excluded as a "sham affidavit" because it contradicts the expert's previous sworn deposition testimony. *Cooper v. Georgia Dep't of Transportation*, 837 F. App'x 657, 665 (11th Cir. 2020) ("Under the 'sham affidavit' rule, a court may disregard an affidavit if it flatly contradicts, without any explanation, clear testimony that the party provided at an earlier deposition.").

Even if the Court considers the new Morris affidavit, it still fails to lift Morris's speculative conclusions about defect and causation into admissible territory and Plaintiff's claims against Remington still fail as a matter of law.

      **B.**    **The Morris opinion that the metal injection molding (MIM) technology used in the manufacture of the Rifle's trigger**

3

> **mechanism components is somehow inferior is unsupported and inadmissible.**

Morris's new affidavit states "metal injection molding technology is widely known to be inferior to the long-proven method of using forged metal and hardened to a specific degree in a trigger design" and "[f]orged metal is far superior to MIM/powder injected processes." (Doc. 62-3 at pp. 1-2.)  Morris fails, however, to cite to any relevant experience, testing, or other scientific literature to support this "widely known" claim.  This is not admissible under *Daubert* and Rule 702.

Similarly, the new Morris affidavit states that the "MIM process used by Remington is cheaper and has proven to be unsafe and dangerous due to the sear contact problems discussed above." (Doc. 62-3 at p. 2.)  Again, Morris offers no literature, testing, or other evidentiary support for this supposedly "proven" claim. The reality is Morris has never performed any testing nor identified any scientific literature that compares the MIM manufacturing process to the forged manufacturing process. He has never presented a photograph or any objective evidence comparing MIM components to forged components. He has never performed or identified any testing, literature, or other evidence related to any of his claims about trigger components made using the MIM process.  That is classic unvalidated rhetoric which does not pass *Daubert* scrutiny and is therefore inadmissible.[2]

---

[2] The expert report of Morris refers only to the powdered metal or "PM" process. (*See* Doc. 60-1.) The new Morris affidavit now states that "powdered metal" and MIM are interchangeable terms.

4

Morris never inspected the subject trigger or its components in any detail to either compare or support his opinions in any objective, let alone scientific, manner. Plaintiff attempts to prop up Morris's new "he can feel roughness" claim by arguing "it would not have been possible to view the sear contact area without conducting destructive testing by disassembling the fire control box and Defendant's own expert admitted that this could not be done." (Doc. 62 at p. 13.) Plaintiff's argument is baseless and contradicts Morris's own sworn testimony:

> Q. Okay. And on this rifle, if you have the stock off, you can look through a view hole in the trigger mechanism and see that sear trigger engagement, can you not?
> A. Correct, yes.
> Q. Did you observe that in this gun?
> A. I did.
> Q. Did you measure it?
> A. I don't really have a precise way to measure that particular point.

(56:2-11.)[3]

Along with his opinion that MIM trigger components are inferior and "rough,"

---

(Doc. 62-3 at p. 1.) But Morris has already admitted he does not know the difference between the powdered metal or "PM" process and the MIM process. (Doc. 62-7, Morris Depo. at 50:13-22 ("**Q.** Do you know if there are any differences between powdered metal process and metal injection molding process. **A.** No, I don't. I'm not a metallurgist.").) Not only is Morris not qualified to opine on these metallurgical processes, Morris's claim is also not true. "Powder metal" or "PM" component manufacturing is a different process than MIM component manufacturing. (*See* Doc. 62-1, Depo. of James Ronkainen (Remington's Rule 30(b)(6) witness) at 62:8-63:8, 116:10-122:8; Doc. 62-2, Watkins Depo. at 21:2-23:9.) Morris's statement that the processes or terms are interchangeable is nothing more than Morris's baseless *ipse dixit*.

[3] Remington's expert used CT scan technology to determine the condition of the Rifle's trigger components. (Doc. 60-6 at pp. 1-2, 8-13.) Morris claims he reviewed those CT scans but nevertheless, he fails to identify a single CT scan that supports his claim that the Rifle trigger components were defective in any way. (Doc. 60-7, Morris Depo. at 18:14-20, 73:9-74:11.)

Morris originally claimed that the subject *trigger* has a "chip" in it. (Doc. 60-1 at p. 2; Doc. 60-7, Morris Depo. at 60:13-17.) In his new affidavit, however, Morris now claims the subject *sear* has a chip in it. (Doc. 62-3 at p. 2.) This new opinion about the condition of the sear component (which is a different component with different purposes, and different mechanical properties and functions than the trigger component) should be stricken pursuant to Rule 37(c). (*See supra*, pp. 2-3.)

Untimeliness notwithstanding, Morris's new "chipped sear" opinion is not admissible because, like the "chipped trigger" opinion before it, Morris has presented no relevant experience, testing, scientific literature, or other reliable basis to support a hypothesis that this supposed "imperfection" is at all dangerous or defective, let alone caused the Rifle to fire without a trigger pull at the time of the incident. Instead, Morris makes another bare, unsupported assertion that this supposed "imperfection would have been extremely unlikely in a forged and hardened process." (Doc. 62-3 at p. 2.) This statement is not based on any testing, scientific or empirical evidence, literature, or any specific relevant experience identified by Morris. It does not meet the rigors of *Daubert* and Rule 702.[4]

---

[4] Morris's claim that the sear is "chipped" or imperfect is refuted by Remington's Rule 26(a)(2)(B) expert, who testified that the markings on the sear are simply the result of the coining process during manufacture. (Doc. 62-2, Watkins Depo. at 151:14-22.) Plaintiff offers nothing to rebut that Watkins's extensive testing of the subject Rifle resulted in it firing in only one way – with the safety OFF and the trigger pulled, exactly as intended. The subject Rifle has no history of ever firing without a trigger pull. Morris's new suggestion that while he never replicated a no-trigger-pull discharge, it still was "likely" to have occurred at the moment of the incident is a textbook example of inadmissible expert *ipse dixit*.

### C. Morris's opinions that "rough" sear contact causes inconsistent trigger pull weights, or makes it "not possible for the sear to reset correctly each time," are unsupported and inadmissible.

The defect claim proffered by Morris appears to be that "rough" trigger to sear contact points or a chipped sear (allegedly from the MIM process): (1) causes inconsistent trigger pull weights; and (2) makes it "not possible for the sear to reset correctly each time with any degree of consistency." (Doc. 62-3 at p. 1.) However, in his original Rule 26 report, his deposition testimony, and now his new affidavit, Morris fails to explain how he came to those conclusions.

***First***, Morris's claim that the variation or inconsistency in trigger pull weights he claims he measured on the Rifle (from 32 ounces to 68 ounces) was caused by the "rough" sear contact points is unexplained. Rather, he simply asserts that the "inconsistency [in trigger pull weight or poundage] is attributable to the rough sear contact which indicates the wide variation in poundage." (Doc. 62-3 at p. 2.) While unclear, it seems Morris is asserting that the variance in his trigger pull force measurements was caused by "rough" contact points, and that he can tell there are "rough" contact points because of the inconsistency of trigger pull weights.

Such circular reasoning is not a reliable method-based testing of his hypothesis and should be excluded. *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 785 (10th Cir. 1999) (citation omitted) (upholding exclusion of unreliable expert testimony: "[i]nstead of reasoning known facts to reach a conclusion, the experts

7

here reasoned from an end result in order to hypothesize what needed to be known but what was not"). Further, Morris's claim that his variable trigger pull force measurements were caused by "rough" surfaces is nothing more than untested and unproven speculation. Morris does not exclude other possible causes of the variation in his trigger pull force measurements. Nor does Morris cite to any trigger pull measurements conducted using his method on any other rifles (with MIM components, forged components, or otherwise) to test whether those would have produced consistent trigger pull results.

**Second**, the claim by Morris that a "rough" sear "makes it not possible for the sear to reset correctly each time with any degree of consistency" is pure speculation. Indeed, this new claim appears to flatly contradict his prior testimony. Morris never measured the trigger to sear engagement on the Rifle (which is measured in thousandths of an inch), or on any other rifle for that matter, because he claims he does not have a precise way to do it, *i.e.*, because he does not have the necessary tools. (Doc. 60-7, Morris Depo. at 56:2-57:21.) Rather, Morris claims he viewed the engagement on the subject Rifle by "eyeballing" it, and he said it looked "great." (*Id.*) In fact, Morris never observed any inconsistent trigger-sear contact on the Rifle:

> Q. Okay. So isn't it true that you never observed any inconsistent sear contact by looking at the contact between the sear and trigger?
> A. I never observed it.
> Q. So what I'm saying is true?
> A. Yes, sir.

(*Id*. at 65:2-8.)   For Morris to claim otherwise now via a new affidavit should be seen for what it is:  an improper "sham" attempt to stave off summary judgment.

> **D. Morris's opinion that low or inconsistent trigger pull weights or inconsistent sear contact "make the gun more susceptible to an accidental discharge" is untested and unreliable speculation.**

Plaintiff argues that "Morris conducted trigger pressure testing using accepted methodology and concluded that a gun is dangerous if it can fire with 32 pounds [*sic*] of trigger pressure and that firing can occur without any trigger pressure if bumped." (Doc. 62 at p. 12.)  Even if Morris's use of an out-of-calibration, squeaky spring scale is an accepted methodology *for measuring trigger pull weights*, it *does not* indicate anything about whether or to what extent trigger pull weights relate to a rifle somehow firing without any trigger pull at all (which is Plaintiff's theory of the case).   Once again, Morris simply posits a conclusion without explanation. Morris has provided nothing to show that a 32-ounce trigger pull weight in any way causes or could cause an accidental discharge *without* a trigger pull of the Rifle (or any rifle).  Morris admitted at his deposition that he has never investigated an accidental discharge or a rifle firing without a trigger pull before this case. (Doc. 62-7, Morris Depo. at 32:9-34:12.) In fact, his actual testing of the Rifle showed it *could not fire* without a trigger pull. (*Id*.) The analytical gap between Morris's testing results and his new conclusion that the rifle "more likely than not" fired absent a trigger pull is the very type of unscientific opinion that courts have long been cautioned to exclude.

9

*See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Morris's claim that any supposed condition in the Rifle "makes the gun more susceptible to an accidental discharge" is simply offered up with no validating evidence. From a *Daubert* and summary judgment perspective, the glaring hole in the Morris defect and causation theory (which Plaintiff cannot escape) is the outright failure by Morris to identify any relevant experience, testing on point, or other scientific evidence to support the claim that the Model 770 trigger mechanism (or any trigger mechanism with MIM components for that matter) is somehow more susceptible to firing without a trigger pull than a trigger mechanism with forged components. Untested speculation and conjecture do not count. That Morris has no pertinent experience with investigating claimed firings without trigger pulls during his 51 years as a gunsmith underscores the point—his opinions are not admissible. Because Plaintiff has not met his burden to establish admissibility, Morris must be excluded.

E. **Plaintiff's "Additional Undisputed Facts" are not undisputed and do not support Plaintiff's case that the subject Rifle is defective and caused the incident.**

In an effort to prop up that Morris used a proper methodology to measure the Rifle's trigger pull force, Plaintiff asserts Remington also uses spring force gauges to measure trigger pull forces in the factory. (Doc. 62 at p. 2.) This argument misses the point. Remington's expert was critical not of the type of scale used by Morris,

10

but rather that the scale was out of calibration, that Morris was twisting and biasing the scale while measuring, and that the scale was squeaking, which indicates frictional contact, on Morris's video. (*See* Doc. 60-6 at pp. 16-17.)[5] Regardless, the trigger pull weight theory advanced by Morris, *i.e.*, that trigger force or "pressure" somehow relates to accidental discharges ***without*** trigger pulls, is untested, unexplained, and not even within Morris's experience. Plaintiff cannot meet his burden to establish the theory is reliable and admissible.

Second, Plaintiff claims Remington's expert testified it is not possible to fully expose the trigger and sear in the subject rifle unless he took apart the fire control, which would have been destructive. (Doc. 62 at p. 3.) This claim, at best, is misleading. The trigger and sear engagement area is visible through the view hole in the trigger mechanism, which Morris admitted to inspecting with the naked eye. (Doc. 60-7, Morris Depo. at 55:3-57:21.) Moreover, Remington's expert subjected the trigger mechanism to CT scan analysis, which provided detailed views of the sear engagement in question. (Doc. 60-6 at pp. 1-2, 8-13.) In fact, while Morris acknowledged that he reviewed the CT scans, he has not identified any scans which support his opinions. (Doc. 60-7, Morris Depo. at 18:14-20, 73:9-74:11.)

Finally, Plaintiff claims "[t]here have been a minimum of 183 similar

---

[5] The new Morris affidavit does not dispute that the spring scale was squeaking or Morris was twisting it while taking measurements. These undisputed facts are obvious alternative causes for Morris's varying trigger pull force measurements. (*See* Doc. 60-6 at pp. 15-17.)

11

occurrences where the Model 770 rifle (with a connectorless trigger system) fired as an accidental discharge without a trigger pull, and Defendant was unable to duplicate the customer's concern." (Doc. 62 at p. 3.) This statement is way off base, disputed and misleading. Remington's corporate representative, James Ronkainen (who Plaintiff cites but neglects to fully quote), testified that certain of those customer complaints were customer reports of unintended discharges from the field, some of which could be duplicated where the trigger had been altered or improperly maintained after leaving the factory. (Doc. 62-1, Deposition of James Ronkainen at 42:13-43:12, 93:14-101:5.) The mere existence of a different customer's complaint about their own rifle (not the subject Rifle) does nothing to fix Morris's inadmissible opinions; indeed, he has not claimed to have reviewed let alone relied on any of them to form his opinions.

It is telling that Plaintiff did not actually supply any such "occurrences" for the Court's consideration; no reports and no testimony from any such customer has been filed. Even if the Court were to scrutinize such information, there is a glaring evidentiary problem with its admissibility. None of these customer purported concerns about their own firearms are admissible to demonstrate a defect in the subject Rifle (let alone causation), in part, because Plaintiff has not even attempted to establish that any of those occurrences or the conditions of those rifles are "substantially similar" to what allegedly happened in this case, which is Plaintiff's

burden and a requirement for their admissibility. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287 (11thCir. 2015); *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1242-43 (11th Cir. 2023). A claim of a customer about a firearm (of unknown condition, care and handling) is unsworn inadmissible hearsay, and not reliable scientific evidence to support Plaintiff's expert's opinions about the subject Rifle.[6]

### F. Morris's opinion that the Rifle fired during the incident without the trigger being pulled or "pressed" because the Rifle was "bumped" while being lowered from the tree stand is inadmissible.

Beyond Morris's unvalidated claim the Rifle is defective, the factual foundation for his causation opinion is also lacking. There is no dispute that as of the drafting of his original expert "report" and December 2023 deposition, Morris had not reviewed a single deposition transcript in this case—that means none of the law enforcement officers that investigated the incident and not even Christal Davis, the sole eyewitness. Indeed, Morris's causation opinion is contrary to the testimony

---

[6] Plaintiff has not even attempted to compare any particular customer complaint to the theory Morris is now trying to advance—that an alleged "rough" trigger to sear engagement results in trigger pull weight variance which could somehow discharge a rifle without a trigger pull. But it is Plaintiff's burden to establish "substantially similarity," which is particularly important in an accidental shooting case where what occurred in the at-issue lawsuit is contested and so is what purportedly occurred in any given customer's complaint. *See, e.g.*, *DePue v. Sears Roebuck & Co.*, 812 F. Supp. 750, 751 (W.D. Mich. 1992) (excluding evidence other incidents involving the same model of shotgun at issue because the causes of the other incidents were disputed and "the facts surrounding the other accidents are not sufficient so as to rule out other causes."). Nor has Plaintiff offered any foundational facts regarding any particular customer complaint, let alone each one of them, which is also classic inadmissible hearsay under Fed. R. Evid. 802. *See, e.g.*, *Johnson v. Ford Motor Corp.*, 988 F.2d 573, 579 (5th Cir. 1993) (upholding the trial court's exclusion of the summary of claims, lawsuits, and complaints because it amounted to "nothing more than a summary of allegations by others which constitute hearsay").

13

of Christal Davis, who was lowering the Rifle by a rope tied through the trigger guard when it fired. Davis testified that the rifle ***did not bump anything*** at the time of the incident. (Doc. 60-2, Davis Depo. at 32:21-33:13; *see also* 127:2-129:8.) Plaintiff nevertheless tries to evade Davis's testimony with the following argument:

> Morris's opinions account for the fact that the gun could have bumped the tree or some other object **without Davis realizing that it happened** as the gun was being lowered in the dark moments before a very traumatic incident occurred. Davis notably was not asked if the gun could have bumped the tree on its way down.

(Doc. 62 at p. 12) (emphasis added.) This argument does nothing to refute, let alone rule out, that the Rifle's trigger was pulled by the rope.

Plaintiff's argument is also contrary to the unequivocal deposition testimony of Davis, including her response to questions asked by **Plaintiff's counsel**:

> Q. Do you know one way or another whether the gun could have made contact with that strap --
> A. Did not. Did not. The gun did not contact anything.
> Q. Okay.
> A. Nothing.
> &#42;&#42;&#42;
> Q. Okay. And so from a standing position you were lowering the rifle down, just releasing the rope --
> A. With both hands.
> Q. -- a little bit at a time and lowering it down?
> A. Little bit at a time.
> Q. To the right of the stand?
> A. Correct.
> Q. And it didn't make contact with anything?
> A. No, sir.

(Doc. 60-2, Davis Depo. at 127:2-129:8.) Plaintiff offers no authority supporting

14

the admissibility of an expert's causation opinion based solely on a hypothetical possibility (bumping the tree) that is refuted by eyewitness testimony. There is no basis that the Rifle "more likely than not" fired because it was allegedly "bumped," and neither Plaintiff nor Morris have attempted to rule out that the Rifle fired because the trigger was pulled by the rope in the trigger guard at the time of the incident. Indeed, neither Plaintiff nor Morris dispute the recreation of the shooting conducted by Remington's expert showing the trigger being pulled by the rope placed through the trigger guard. (Doc. 60-6 at pp. 22-23.) Inability to rule out the obvious non-defect reason the Rifle fired is also a basis to grant Remington's motion.

## II. CONCLUSION

The change of Morris's original defect and causation opinions to the opinion now proffered via an untimely affidavit (that his alleged defects "more likely than not" caused the occurrence) was not the result of any additional testing, research, or investigation conducted by Morris after his deposition. Rather, the change is a half-baked attempt to avoid the dispositive impact of Morris's testimony cited in Remington's motion. (Doc. 60-7, Morris Depo. at 48:15-21, **Q:** … Can you say it to a reasonable degree of certainty that these unreasonably dangerous conditions that you say exist in this rifle caused it to fire without the trigger being pulled? **A:** No.). Because Morris's defect and causation opinions are not admissible, Remington should be granted summary judgment on all of Plaintiff's claims.

Dated: February 28, 2024.

          Respectfully submitted,

          **REMINGTON ARMS COMPANY, LLC**

          By: */s/ Reid C. Carpenter*

Reid C. Carpenter
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
(205)581-0700
rcarpenter@lightfootlaw.com

Dale G. Wills (*pro hac vice*)
Andrew A. Lothson (*pro hac vice*)
Swanson, Martin & Bell, LLP
330 N. Wabash Avenue, Ste. 3300
Chicago, IL 60611
(312) 321-9100
dwills@smbtrials.com

**Attorneys for Defendant, Remington Arms Company, LLC**

## CERTIFICATE OF SERVICE

This is to certify that on February 28, 2024, I filed the foregoing with the Clerk of Court via its electronic filing system, which will serve a copy upon each registered party or counsel.

*/s/ Reid C. Carpenter*
Of Counsel
