FILED

2024 Jun-13  AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES ANDREW SCOTT, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-1891-GMB |
| | ) | |
| REMINGTON ARMS COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff James Andrew Scott, II filed a complaint against Remington Arms Company, LLC ("Remington") alleging that defects in the trigger mechanism for a Remington Model 770 bolt-action rifle caused it to fire unexpectedly, resulting in the death of his daughter, Alyssa Brooke Scott. Doc. 1-1. The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 11. Before the court is Remington's combined Motion to Exclude the Opinions of Plaintiff's Proffered Liability Expert and Motion for Summary Judgment. Doc. 60. The motion is fully briefed (Docs. 60, 62, 63, 65) and ripe for decision.[1] For the following reasons, the motion is due to be granted.

---

[1] In its reply, Remington moved to exclude an affidavit from Scott's expert filed in opposition to the motion to exclude and motion for summary judgment. Doc. 63 at 2–7. The court ordered Scott to respond to Remington's arguments for excluding the affidavit (Doc. 64), and Scott responded. Doc. 65.

# I.  FACTUAL BACKGROUND

The court first addresses the shooting incident and rifle,[2] followed by the opinions of Scott's expert.

## A.    The Incident

This case arises from a tragic accident.  On November 13, 2017, 15-year-old Alyssa and her godmother Christal Davis went deer hunting together. Doc. 1-1 at 4; Doc. 60-2 at 11, 13.  After climbing into an elevated tree stand, Alyssa loaded her Remington Model 770 bolt-action rifle with a round in the chamber and a full magazine, and she began looking for deer. Doc. 60-2 at 14–16.  Davis climbed into the tree stand after Alyssa and watched a television show on a tablet device with earbuds while Alyssa hunted. Doc. 60-2 at 15.

At about 4:45 p.m., Alyssa and Davis decided to end the hunt. Doc. 1-1 at 4; Doc. 60-2 at 3–4, 16.  Alyssa unloaded the chambered round from the rifle, handed the round and the rifle to Davis, and climbed from the deer stand down to the ground. Doc. 60-2 at 17–18.  While still in the stand, Davis removed the magazine, then placed both the magazine and the round Alyssa handed to her in her backpack. Doc. 60-2 at 18–19.  She then checked the chamber of the rifle to make sure there

---

[2] Scott did not address the facts surrounding the shooting or the descriptions of the rifle in his response to the pending motion (*see* Doc. 62), so the facts in this opinion are largely taken from Remington's brief and the evidence Remington submitted.  Even so, the court views them in the light most favorable to Scott, as the non-movant, and gives Scott the benefit of all reasonable inferences.

was no round inside. Doc. 60-2 at 18–19.  Davis closed the rifle's bolt and tied a nylon rope through the trigger guard to lower the rifle to Alyssa. Doc. 60-2 at 19–21.  Davis testified that she tied the rope behind the trigger and made sure there was no slack in the knot. Doc. 60-2 at 19.  Alyssa told Davis that she turned on the rifle's manual safety switch before she handed over the gun, but Davis does not remember personally checking the position of the safety before she began to lower the rifle from the deer stand. Doc. 60-2 at 15–16, 20, 21.

Davis lowered the rifle with the muzzle pointing down and the rope fastened through the trigger guard. Doc. 60-2 at 19.  About halfway down, the gun fired and the bullet struck and killed Alyssa. Doc. 60-2 at 32–33.  The gun did not touch or bump anything as Davis lowered it to the ground. Doc. 60-2 at 8–9.

Kerry L. Bradford, an officer with the Alabama Department of Conservation and National Resources, Wildlife and Freshwater Fisheries Division, prepared a Hunting/Shooting Incident Report based on his investigation of the shooting. Doc. 60-4.  In the report, Bradford noted that the safety was in the "off" position when he inspected the gun. Doc. 60-4 at 2.  He concluded that the two most important contributing factors were (1) the firearm was not unloaded and (2) the careless or reckless handling of the firearm. Doc. 60-4 at 3.  In answering the question of "what could have been done differently to prevent this incident," Bradford stated that "[t]he firearm could have been double checked to ensure that it was properly unloaded and

the safety was 'on' before lowering from the stand.  Also the pull-up rope could have been attached elsewhere besides the trigger guard." Doc. 60-4 at 3.

**B.    Remington Model 770 Rifle**

Remington introduced the Model 770 bolt-action rifle in 2007 and manufactured the rifle at all times relevant to this action. *See* Doc. 60-6 at 3; Doc. 1-1 at 4.  The rifle's fire control uses both a primary manual safety and a redundant internal safety and has four positions: (1) cocked with the manual safety in the on or safe position, (2) cocked with the manual safety in the off or fire position, (3) uncocked after firing with the trigger fully pulled, and (4) uncocked after firing and after releasing the trigger. Doc. 60-6 at 5–6.

The rifle uses a sear-override trigger mechanism. Doc. 60-6 at 3–4.  This means that when the manual safety is in the on or safe position, the manual safety lifts and holds the sear off the trigger causing the redundant internal safety to block the trigger from being pulled. Doc. 60-6 at 5.  When the rifle is cocked, the sear restrains the firing pin head, preventing the rifle from discharging. Doc. 60-6 at 4–5.  However, when the rifle is cocked and the safety is off, the rifle fires when the trigger is pulled, which causes the sear to drop, permitting the firing pin head to move forward, override the sear, strike the primer of the chambered round, and discharge the round. Doc. 60-6 at 4–5.

"Sear engagement" is the amount of physical overlap between the trigger and

sear when the rifle is cocked and the manual safety is off. Doc. 60-6 at 6; Doc. 60-7 at 15.  The amount of a rifle's sear engagement is set at the factory. Doc. 60-6 at 6. Remington fabricated the trigger of the Model 770 using a metal injection molding process, while it used precision secondary grinding operations to form the sear and the trigger engagement surfaces. Doc. 60-6 at 13.

**C.       The Opinion of Jerry Morris**

Jerry Morris is Scott's liability expert. *See* Doc. 60-1.  Morris has been a gunsmith for 51 years and has "worked on hundreds of makes and models of firearms[,] serviced over 10,000 firearms," and taught classes on gunsmithing. Doc. 60-1 at 4.  He has not authored any publications in the last ten years, nor has he testified as an expert witness in the last four years. Doc. 60-1 at 4–5.  His expert report represents that he "has extensive knowledge and experience with the Remington 770 rifle, and the trigger system in particular." Doc. 60-1 at 4.

Morris inspected the rifle once and performed two types of testing: (1) trigger pull weight testing using a RCBS spring scale and (2) function testing. Doc. 60-1 at 3; Doc. 60-7 at 4, 9–10.  In the first type of testing, Morris performed about ten trigger pulls and his measurements ranged from 32 to 68 ounces.[3] Doc. 60-1 at 3; Doc. 60-7 at 4.  During the function test, Morris closed the bolt, turned the safety

---

[3] The pictures from the testing appear to show that Morris' spring scale was not properly calibrated. *See* Doc. 60-6 at 16.

off, pulled the trigger, and attempted to make the rifle fire without pulling the trigger. Doc. 60-1 at 9–10.  Morris could not make the "rifle discharge without the trigger moving." Doc. 60-7 at 10.  Instead, he "believe[s] the gun could have fired by being bumped the way it was being handled."[4] Doc. 60-7 at 10.

Morris contends that Remington's decision to design and manufacture the trigger and sear with a powdered metal process made the trigger mechanism unreasonably dangerous. Doc. 60-1 at 1–2.  He concluded there are defects in the sear contact area of the Model 770 trigger mechanisms because "the use of inferior powdered metal in the components of the trigger system results in rough contact points within the trigger assembly, including between the safety sear cam and the trigger connector," and the rough contact points cause inconsistent trigger pull measurements. Doc. 60-1 at 1–2; Doc. 60-7 at 13–14.  Morris also offered the opinion that the "trigger connector showed signs of having a chip missing from it" and concluded that "Remington should have manufactured the subject trigger assembly using hardened forged steel that would create a more consistent contact point." Doc. 60-1 at 2, 3.

According to Morris, rough sear contact points or a chipped trigger can cause "unpredictable and inconsistent sear contact." Doc. 60-1 at 2.  And "[w]ith less sear

---

[4] Morris performed "bump tests" but could not make the rifle fire without pulling the trigger. Doc. 60-7 at 9–10, 16.

contact, there is a higher probability of the sear dropping accidentally, resulting in an unintended firing." Doc. 60-1 at 2.  The rough surface or chipped trigger "also causes a wide variation in trigger pressure," which "makes it more likely to cause the gun to fire unexpectedly such as the unintended discharge like the one that killed Alyssa Scott." Doc. 60-1 at 2.

Morris did not take any measurements of the sear engagement for the gun at issue here, nor did he take any photographs or video of his engagement observations. Doc. 60-7 at 15–17.  He never observed any inconsistent sear contact or engagement in his visual inspection of the contact between the sear and the trigger before he performed his trigger pull tests. Doc. 60-7 at 17.  And he did not perform any tests or measurements to determine the roughness of the contact points of the trigger and sear. Doc. 60-7 at 17.

## II. MOTION TO EXCLUDE EXPERT OPINION

Remington argues that Morris is not qualified to offer opinions on defect or causation. Doc. 60 at 13–26.  With his response in opposition to the motion for summary judgment, Scott filed a new affidavit from Morris responding to many of Remington's arguments. Doc. 62-3.  Remington argues that the court should exclude the affidavit under Federal Rules of Civil Procedure 37 and 26.[5] Doc. 63 at 2–4.

---

[5] In the alternative, Remington also argues that even the new evidence "fails to lift Morris's speculative conclusions about defect and causation into admissible territory and Plaintiff's claims

Scott filed an opposition to the motion to exclude. Doc. 65.  The court will begin

with the evidentiary issue presented by the new Morris affidavit and then turn to the

admissibility of Morris' expert opinion.

## A.   New Morris Affidavit

Federal Rule of Civil Procedure 26(a) sets the disclosure requirements for

witnesses and expert witnesses.   Rule 26(a)(2) requires a party to disclose the

identities of expert witnesses who may testify at trial.  In addition to the experts'

identities, the party must disclose the experts' written reports if the experts are

retained or specially employed to provide expert testimony. Fed. R. Civ. P.

26(a)(2)(B); *see also Prieto v. Malgor*, 361 F.3d 1313, 1317–18 (11th Cir. 2004)

(noting that under Rule 26(a)(2) the "[n]otice of the [retained or specially employed]

expert witness' name is not enough" and "[e]ach witness must provide a written

report [containing specified information]"); *Reese v. Herbert*, 527 F.3d 1253, 1265

(11th Cir. 2008) ("'Disclosure of expert testimony' within the meaning of the federal

rule contemplates not only the identification of the expert, but also the provision of

a written report [containing specified information].") (citing Fed. R. Civ. P.

26(a)(2)(B)).  Each report must contain a complete statement of the expert's opinions

and qualifications, a list of all other cases in which the expert has testified in the

---

against Remington fail as a matter of law." Doc. 63 at 4.  The court does not consider these
alternative arguments (Doc. 63 at 5–11) because the affidavit is due to be excluded for the reasons
discussed below.

previous four years, and a statement of the compensation to be paid for the expert's testimony, among other things. Fed. R. Civ. P. 26(a)(2)(B).  A party must make its expert witness disclosures within the time prescribed by the court. Fed. R. Civ. P. 26(a)(2)(D).

"[T]he expert disclosure rule is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Reese*, 527 F.3d at 1265 (internal quotation marks omitted).  "The rule also seeks to allow for opposing counsel to have an 'opportunity to depose [the disclosed expert], proffer a rebuttal expert, or file a *Daubert* motion.'" *Rondini v. Bunn*, 2020 WL 136858, at *2 (N.D. Ala. Jan. 13, 2020) (quoting *Reyes v. BJ's Rests., Inc*., 774 F. App'x 514, 517 (11th Cir. 2019)).  "Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." *Reese*, 527 F.3d at 1266.

A party's failure to provide its expert disclosures by the court's deadline precludes it from using the expert or his testimony on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1); *see also OFS Fitel, LLC v. Epstein, Becker & Green, P.C*., 549 F.3d 1344, 1363 (11th Cir. 2008) ("Under Rule 37(c)(1), a district court clearly has authority to exclude an expert's testimony where a party has failed to comply with Rule 26(a)

unless the failure is substantially justified or is harmless.") (emphasis omitted). "'The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party.'" *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc*., 233 F.R.D. 687, 697 (N.D. Ga. 2006)). In determining whether a failure to disclose was substantially justified or harmless, the Eleventh Circuit instructs courts to consider "the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party." *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009) (citing *Romero v. Drummond Co., Inc*., 552 F.3d 1303, 1321 (11th Cir. 2008)). "A district court has broad discretion to exclude expert testimony when a party fails to comply with its deadlines," *Woodard v. Town of Oakman, Ala.*, 970 F. Supp. 2d 1259, 1267 (N.D. Ala. 2013), and the Eleventh Circuit's review of a district court's decision whether to exclude expert testimony under Rule 37 as a sanction for a Rule 26 violation is "limited and deferential." *Mitchell*, 318 F. App'x at 825.

Scott argues that Rule 37 does not apply because Morris' new affidavit is "merely an elaboration of the previously disclosed opinion" that "go[es] into deeper detail in support of his disclosed opinion." Doc. 65 at 2. The court does not agree. A review of Morris' affidavit (Doc. 62-3) leaves no doubt that it contains both new opinions and direct contradictions of his disclosed opinions and deposition

testimony.  For example, in his report and deposition, Morris contended that the trigger had a chip in it. Doc. 60-1 at 2; Doc. 60-7 at 16.  But in his affidavit, Morris explains that the chip is in the sear. Doc. 62-3 at 2.  The trigger and sear are materially different components with different purposes, mechanical properties, and functions. *See* Doc. 60-6 at 4–6.  Additionally, Morris' new affidavit states that the rough sear "makes it not possible for the sear to reset correctly each time with any degree of consistency." Doc. 62-3 at 2.  His deposition testimony, however, makes clear that he did not have the ability to measure the trigger to sear engagement, that when he viewed the engagement on the rifle it looked "great," and that he "never observed any inconsistent sear contact by looking at the contact between the sear and trigger." Doc. 60-7 at 15, 17.  Morris does not give any reasoning or explanation for the evolution of his opinions in the new affidavit. *See* Docs. 62, 62-3, 65.

Scott does not cite any authority for the admissibility of an untimely elaboration of an expert opinion.  This is for good reason since courts routinely reject late attempts to bolster expert reports. *See, e.g., Eli Research, LLC v. Must Have Info Inc.*, 2015 WL 13734988, at *3 (M.D. Fla. Sept. 9, 2015); *Beauregard v. Cont'l Tire N. Am., Inc.*, 2009 WL 1011121, at *2 (M.D. Fla. Apr. 15, 2009); *3M Innovative Prop. Co. v. Dupont Dow Elastomers, LLC*, 2005 WL 6007042, at *4 (D. Minn. Aug. 29, 2005); *DAG Ent. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 110 (D.D.C. 2005); *Beller v. United States*, 221 F.R.D. 696, 694–95 (D.N.M. 2003); *Akeva, LLC v.*

*Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002); *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998).

The Rules of Civil Procedure do allow for the supplementation of expert reports in certain limited circumstances, such as when the party or expert learns that the information previously disclosed is incomplete or incorrect in some material respect. Fed. R. Civ. P. 26(e). This provision, however, is "not intended to provide an extension of the expert designation and report production deadlines" and should not be used for this purpose. *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998). Permissible supplementation instead "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener*, 181 F.R.D. at 640. The supplementation rule "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Leviton Mfg. Co., Inc. v. Nicor, Inc.*, 2007 WL 1306759, at *4 (D.N.M. Apr. 20, 2007) (quoting *Beller*, 221 F.R.D. 696, 701); *see also Friebel v. Paradise Shores of Bay County, LLC*, 2011 WL 2420230, at *2 (N.D. Fla. June 13, 2011) (recognizing that courts must take care to "distinguish true supplementation (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship"); *Navarro v. Applebee's Intern., Inc.*, 2010 WL 3745905, at *1 (M.D. Ga. Sept. 20, 2010) (recognizing that the "purpose of civil discovery . . . is to remove surprise from trial

preparation and allow the parties to acquire evidence necessary to evaluate and resolve their dispute").

Instead, a supplemental expert report setting out additional opinions or rationales or seeking to strengthen opinions expressed in the original expert report exceeds the bounds of Rule 26 supplementation and is subject to exclusion under Rule 37(c)(1).[6] *Beller*, 221 F.R.D. at 695; *Keener*, 181 F.R.D. at 641–42; *see also WhereverTV, Inc., Comcast Cable Comms., LLC*, 2023 WL 2734332, at *1 (M.D. Fla. Mar. 31, 2023) ("If a supplemental expert disclosure is not in conformity with the requirements set forth in Rule 26(e)(1)(A), the supplemental report may be excluded . . . pursuant to Rule 37(c)."). "To rule otherwise would create a system where preliminary [expert] reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Beller*, 221 F.R.D. at 695. Such a practice would be the antithesis of the orderly expert disclosure regime of Rule 26(a). And permitting late supplementation

---

[6] In contrast, parties may supplement an expert report in response to a motion for summary judgment so long as the supplementation does not exceed the scope of the expert report. *See Miele v. Certain Underwriters at Lloyd's of London*, 559 F. App'x 858, 861–62 (11th Cir. 2014) (declining to strike an expert's belated declaration under Rule 37(c) when it was filed with a motion for summary judgment because the declaration was "materially similar" to the expert report); *Khan v. KIR Tampa 003, LLC*, 2015 WL 8207813, at *4 (M.D. Fla. Dec. 4, 2015) ("[T]o the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery.") (citation omitted). The affidavit here exceeds the scope of the original expert report and makes substantive changes to the expert's opinions.

of expert reports denies the opposing party the opportunity to file a meaningful *Daubert* motion challenging any questionable expert testimony.

In sum, Morris' affidavit is a violation of Rule 26 since it is untimely under the existing scheduling order and contains new reasoning and opinions.   The scheduling order required Scott to disclose his expert's Rule 26 report on or before October 2, 2023. Doc. 55 at 1.  Scott disclosed the new affidavit when he filed it in opposition to summary judgment on February 14, 2024. Doc. 62-3.  This disclosure was four months after his expert disclosure deadline, two months after Morris' deposition, and three weeks after Remington filed its motion to exclude Morris' opinions and motion for summary judgment.  The affidavit also does not qualify as a supplementation under Rule 26(e) because it goes well beyond correcting or completing inaccuracies or omissions in the original expert report.

Accordingly, Scott "is not allowed to use [the Morris affidavit] to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  But Scott does not argue that the failure to timely disclose this evidence was substantially justified or harmless, despite being given the opportunity to do so.  Instead, Scott rests on his argument that the evidence is an expansion or elaboration of Morris' previous testimony, which the court rejects.  For these reasons, the court will not consider the new affidavit in determining the admissibility of Morris' opinions or the motion for

summary judgment.

## B.    Expert Admissibility Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony and evidence. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).  It provides that a

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, 509 U.S. 579 (1993), the United States Supreme Court made clear that Rule 702's purpose is to ensure that expert evidence is both reliable and relevant. *McCreless v. Global Upholstery Co.*, 500 F. Supp. 2d 1350, 1353 (N.D. Ala. 2007).  The *Daubert* principles apply to all expert testimony, whether based on scientific, technical, or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999).  "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question," a district court "must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592).

Building on these principles, the Eleventh Circuit established a "rigorous

three-part inquiry" for determining the admissibility of expert testimony. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  This inquiry requires a court to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  The burden of satisfying this inquiry rests with the proponent of the expert testimony. *Id*.  The court possesses broad discretion when assessing the reliability of expert testimony. *Id*. at 1264.

## C.    Discussion

Remington challenges all of Morris' opinions.  First, Remington contends that he is not qualified to offer his defect opinion and that this opinion is not based on any reliable method-based testing, literature, observations, or experience. Doc. 60 at 17–23.  Second, Remington argues that Morris' causation opinion is not supported by any testing, the evidence in this case, or his personal experience. Doc. 60 at 23– 26.  The court combines its analysis of both opinions.

### 1.    *Qualification*

The court considers various factors in deciding whether to qualify an

individual to offer expert testimony on any subject. *Frazier*, 387 F.3d at 1260 (citing plain language of Rule 702). "While scientific training or education may provide means to qualify, experience in a field may offer another path to expert status." *Id.* at 1260–61. Additionally, an expert's qualifications must correspond to the subject matter of his proffered testimony. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999). The standard for finding an expert qualified to testify on a given topic is "not stringent," and "so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (internal quotation marks omitted) (alteration adopted).

Notwithstanding this minimal standard, the court agrees with Remington that Morris is not qualified to offer his defect or causation opinions. Morris premises his opinion on the manufacturing process of the Model 770's trigger and sear. He claims that Remington uses "inferior powdered metal[7] in the components of the trigger system" resulting in "rough contact points" between the trigger and sear. Doc. 60-1 at 1. The rough sear contact is unpredictable and inconsistent according to Morris— "[w]ith less sear contact, there is a higher probability of the sear dropping accidently,

---

[7] Remington asserts that Morris is factually incorrect about to the trigger manufacturing process (Doc. 60 at 12 n.2), and Morris attempts to explain his use of differing terminology in his inadmissible affidavit. Doc. 62-3 at 1–2. Regardless of the process used, Morris does not have the training or experience to opine about either process.

resulting in an unintended firing." Doc. 60-1 at 2.  And the sear contact issues also result in a wide variation of trigger pressures resulting in "inconsistent firing poundage which makes it more likely to cause the gun to fire unexpectantly." Doc. 60-1 at 2.  Morris explains that Remington should have used "hardened forged steel" to "create a more consistent sear contact point." Doc. 60-1 at 3.

Morris is a gunsmith with 51 years of experience who has worked with hundreds of makes and models of firearms and serviced over 10,000 firearms. Doc. 60-1 at 4.  He states in his report that "[h]e has extensive knowledge and experience with the Remington 770 rifle, and the trigger system in particular." Doc. 60-1 at 4.  However, when questioned about that knowledge and experience during his deposition, Morris testified that he has repaired only two Model 770 rifles and has cleaned about a dozen. Doc. 60-7 at 8–9 & 20.  The repair work on those 770 rifles came in response to complaints that it required too much pressure to pull the trigger. Doc. 60-7 at 9.  He performed function tests on the rifles but could not make them fire without pulling the trigger. Doc. 60-7 at 9–10.  He has never investigated a claim of accidental discharge of a Remington bolt-action rifle. Doc. 60-7 at 9.

Other than to state that "Mr. Morris has developed extensive knowledge of firearms over several decades and, while he is not the traditional 'hired gun' expert witness . . . that does not mean he is not qualified as an expert on firearms" (Doc. 62

at 2), Scott does not address Remington's specific arguments about Morris' qualifications.   In effect, Scott relies solely on Morris' "decades of practical experience" as a gunsmith (Doc. 62 at 14) to qualify him to offer his opinions.  While experience in a field certainly may be a way to build expert qualifications, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, Advisory Committee's Note to 2000 amendments.  Scott essentially asks the court to do just that, but Morris has not explained how his experience as a gunsmith relates to his opinion on metal properties or the process Remington used to manufacture the trigger and sear.  In fact, there is no evidence that Morris has any experience or education as a metallurgist or engineer that could qualify him to testify on these subjects.  Nor does he have any experience or education with any trigger or sear manufacturing or design principles.  Morris may know a lot about guns, but there is no evidence that he ever investigated or studied the materials in the Model 770 trigger mechanism.  He has not designed any fire controls or fire control components and has not reviewed any manufacturing or design records related to the Model 770 rifle. Doc. 60-7 at 8.  In fact, he admits that he has only repaired two 770 rifles and cleaned about a dozen in his long history as

a gunsmith. Doc. 60-7 at 8–9, 20.  And as to this particular gun, he did not measure the sear engagement or contact points between the trigger and sear since he did not have the proper tools. Doc. 60-7 at 15, 17.

Simply put, Morris is not qualified to offer an opinion on the metallurgical properties or design process of the trigger or sear in the Remington Model 770 rifle. This lack of qualification renders his opinions inadmissible since Morris premises his defect and causation opinions on the materials and process Remington used to manufacture the trigger and sear.

### 2.    *Reliability*

Even if Morris had the qualifications to offer his opinions, they would fail the reliability prong of the *Daubert* inquiry.  In assessing the reliability of expert testimony, a court must focus on the expert's methodology for reaching his or her opinions, rather than on the opinions themselves. *Daubert*, 509 U.S. at 594–95.  "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence," *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003), but "[t]o see if how [an expert] got to where he ended up makes reasoned, scientific sense." *McCreless*, 500 F. Supp. 2d at 1353 (N.D. Ala. 2007).  *Daubert* instructs the court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

applied to the facts in issue," *Daubert*, 509 U.S. at 592–93, and lists four factors that courts should consider in this assessment: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. *Id*. at 593–94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262. Accordingly, "the trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co*., 526 U.S. at 152. Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. And "[a]lthough testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with a good explanation as to why his or her conclusion remained reliable notwithstanding the absence of testing." *Hendrix v. Evenflo Co., Inc*., 255 F.R.D. 568, 588–89 (N.D. Fla. 2009) (internal quotations omitted).

Morris' opinions lack the indicia of reliability *Daubert* requires. First, he did not produce any literature, reports, or other documentation to support his contention that the Model 770's components are inferior to other fire controls using different

processes or materials.  Importantly, he did not provide any testing, explanation, or other support for his theory that using hardened forged steel would create a more consistent contact point between the sear and the trigger.  Instead, there is simply no explanation in the record for the methodology he used in reaching his conclusions. *Daubert* requires more. *See, e.g., Borum v. Werner Co.*, 2012 WL 2047678, at *12 (N.D. Ala. June 6, 2012) (excluding an opinion where the expert "fail[ed] to properly explain his methodology with respect to his theory that the ladder was defectively designed—more specifically, [the expert] neglect[ed] to account for industry standards, why additional bracing is recommended, the feasibility of his proposed alternative design, and testing for the alternative design") (internal quotation marks omitted).

Additionally, Morris did not provide any measurements or objective observations of rough contact points or surfaces between the sear and trigger in the rifle at issue here.  In fact, he admitted that he did not have the tools to measure them. Doc. 60-7 at 17.  And while in his deposition Morris pointed to the scans done by Remington's expert to support his chipped trigger theory (Doc. 60-7 at 20–21), he did not identify the photograph in question, explain the location of the chip purportedly depicted in the photograph, or substantively discuss the photograph and how it supports his theory. Doc. 60-7 at 20–21.  This falls well short of a "good explanation" for "why his . . . conclusion remained reliable notwithstanding the

absence of testing." *Hendrix*, 255 F.R.D. at 588.  Likewise, Morris offered the opinion that the low and inconsistent trigger pull forces he documented resulted from a chipped trigger or rough contact points between the trigger and sear (*see* Doc. 60-7 at 17), but this testimony merely assumes the presence of a chipped trigger or rough contact points without any evidence supporting that assumption.

Simply put, Morris did not perform any testing or offer any evidence to show that any of the alleged dangerous conditions—"powdered metal" trigger components, rough sear contact points, a chipped trigger, or inconsistent trigger pull weights—caused the rifle to fire without activating the trigger.  Instead, he made assumptions and pronouncements without offering factual evidence to support them. Accordingly, the court concludes that his opinion fails *Daubert*'s reliability requirement.

### 3.    *Assisting the Trier of Fact*

Finally, Federal Rule of Evidence 702 requires that expert testimony "assist the trier of fact to understand the evidence or determine a fact in issue."  Rule 703, in turn, mandates that "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."  The rules do not "provide for an expert opinion based on sheer speculation over the circumstances surrounding the issue upon which he or she purports to provide expert testimony." *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d

1267, 1283 (M.D. Ala. 1998).

"Basing an expert opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a fact in issue." *Id*. (citation and internal quotation marks omitted).  Instead, testimony by an expert must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (citation omitted).  "Without an underlying basis of support, the 'expert's' opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence." *Browder*, 5 F. Supp. 2d at 1283.

Multiple portions of Morris' opinions are not based on facts in evidence, and thus would not assist the trier of fact.  The most glaring example is his position that "the gun could have fired by being bumped the way it was being handled." Doc. 60-7 at 10.  There is no evidence that the gun bumped the tree or anything else on its way down; instead, the uncontroverted evidence from the single surviving eyewitness is that the gun did not bump the tree. Doc. 60-2 at 8–9, 32–33.  Morris' theory that the gun could have bumped the tree as it was lowered to the ground therefore is based on pure speculation and would not aid the trier of fact. *See Browder*, 5 F. Supp. 2d at 1283.  For all of these reasons, Morris' expert opinion is due to be excluded.

### III.  MOTION FOR SUMMARY JUDGMENT

With the exclusion of Morris' expert opinions, Remington contends that Scott has not offered sufficient evidence to support his product liability claims. Doc. 60 at 26–29.  The court agrees.[8]

### A.     Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).  The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp*., 477 U.S. at 323.  If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id*. at 324.  "Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

---

[8] Scott does not substantively address Remington's summary judgment arguments. *See* Doc. 62.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id*. at 248.  If the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Id*. at 249–50 (internal citations omitted).  All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## B.    Discussion

The complaint includes claims for negligence or wantonness, a violation of the Alabama Extended Manufacturers Liability Doctrine ("AEMLD"), and breach of warranty. Doc. 1-1 at 6–8.  Remington contends that all of these claims fail as a matter of law without admissible expert opinion testimony to support Scott's defect and causation theories. Doc. 60 at 26–29.

To state a claim under the AEMLD, a plaintiff must prove, among other things, that (1) he suffered injury proximately caused by a product that was in a defective and unreasonably dangerous condition and (2) the product reached the plaintiff without substantial change in condition from when it was sold. *Casrell v. Altec Indus., Inc*., 335 So. 2d 128, 132–33 (Ala. 1976); *Jordan v. Gen. Motors Corp*., 581 So. 2d 835, 836–37 (Ala. 1991) ("[B]ecause the AEMLD is a fault-based cause

of action, the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition.").  Likewise, where the same defect and causation theories underlie negligence and breach of warranty claims, those claims require proof of a defect. *See Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133, 1137–38 (S.D. Ala. 1999); *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 996 (Ala. 1981).  For this reason, if the AEMLD design defect claim fails, so do Scott's negligence and breach of warranty claims. *See Connally*, 86 F. Supp. 2d at 1138.

For any of his claims to survive summary judgment, Scott must show that the rifle was defective and that the defect caused his daughter's injuries. *See, e.g., Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1276 (M.D. Ala. 1999). Under Alabama law, a plaintiff must affirmatively establish the defect in a product because "the failure of a product does not presuppose the existence of a defect." *Townsend v. General Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994).  To that end, "'ordinarily, expert testimony is required' in AEMLD cases" to prove that the product is defective and that the defective condition of the product caused the product to fail and injure the plaintiff. *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1338 (M.D. Ala. 2001) (quoting *Sears, Roebuck & Co.*, 395 So. 2d at 995).

Scott does not dispute that expert testimony is a necessary ingredient of his case.  Indeed, under the AEMLD, Alabama courts consistently require expert

testimony to prove a defect whenever the product is "complex and technical." *Townsend*, 642 So. 2d at 415 (requiring expert testimony to prove the existence of a defect in a vehicle's brake system); *see also Britt v. Chrysler Corp.*, 699 So.2d 179, 181 (Ala. Civ. App. 1997) (requiring expert testimony to prove the existence of a defect in an air bag system).  There is no question that the Remington Model 770 rifle is "of a complex and technical nature such that a lay juror could not, in the absence of expert testimony, infer that a defective condition of the product caused the product's failure and caused the resulting injury to the plaintiff." *Cooper*, 76 F. Supp. 2d at 1276.  But without Morris' opinions, Scott has not produced admissible expert testimony to support the essential elements of his claims.  This failure ends the court's inquiry into summary judgment.  Put another way, Remington is due summary judgment because defective design or manufacture and proximate causation are essential elements of all of Scott's claims.

In conclusion, the court reiterates that "[u]nder the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably safe for its intended purposes and uses.  However, the manufacturer of a product is not an insurer against all harm that might be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product." *Verchot v. General Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001) (citations and quotation marks omitted).  The AEMLD is a fault-based doctrine such

28

that plaintiffs "must prove more than the fact that an injury occurred while [the plaintiff was] using the product . . . . [T]he plaintiff must affirmatively show a defect in the product." *Id.* (citations and quotation marks omitted, first alteration in original). In the final analysis, the rifle was involved in a tragic accident but Scott has not offered competent evidence proving that a defect in the rifle caused the accident.

## IV. CONCLUSION

For these reasons, it is ORDERED that Remington's Motion to Exclude the Opinions of Plaintiff's Proffered Liability Expert and Motion for Summary Judgment (Doc. 60) is GRANTED. A separate final order will be entered.

DONE and ORDERED on June 13, 2024.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE